UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

<u>Autumn O'Rourke</u>,
     Plaintiff

     v.                               Case No. 12-cv-445-SM
                                              Opinion No. 2014 DNH 024
<u>Boyne Resorts d/b/a Loon</u>
<u>Mountain Recreation Corporation</u>,
     Defendant

## O R D E R

Plaintiff, Autumn O'Rourke, brings this action against her former employer, Boyne Resorts, d/b/a Loon Mountain Recreation Corporation ("Loon Mountain" or "Loon").  She seeks damages for alleged acts of discrimination.  More specifically, she says Loon violated Title VII, 42 U.S.C. § 2000e, by terminating her employment on account of her pregnancy.  She also alleges that Loon retaliated against her fiance's mother because O'Rourke filed a discrimination charge with the state human rights authority.  In addition, O'Rourke advances several state common law and statutory claims.  Loon moves for summary judgment, doc. no. 17, asserting that there are no genuinely disputed issues of material fact and that it is entitled to judgment as a matter of law.

**Standard of Review**

When ruling on a motion for summary judgment, the court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990).  Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In this context, "a fact is 'material' if it potentially affects the outcome of the suit and a dispute over it is 'genuine' if the parties' positions on the issue are supported by conflicting evidence." Int'l Ass'n of Machinists & Aerospace Workers v. Winship Green Nursing Ctr., 103 F.3d 196, 199-200 (1st Cir. 1996) (citations omitted).  Nevertheless, if the non-moving party's "evidence is merely colorable, or is not significantly probative," no genuine dispute as to a material fact has been proved, and "summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986) (citations omitted).

The key, then, to defeating a properly supported motion for summary judgment is the non-movant's ability to support his or her claims concerning disputed material facts with evidence that conflicts with that proffered by the moving party.  See generally Fed. R. Civ. P. 56(c).  It naturally follows that while a

reviewing court must take into account all properly documented facts, it may ignore a party's bald assertions, speculation, and unsupported conclusions.  See Serapion v. Martinez, 119 F.3d 982, 987 (1st Cir. 1997).  See also Scott v. Harris, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

## Background

Except where noted, the following facts are undisputed. Loon Mountain is a year-round resort located in Lincoln, New Hampshire.  In November of 2010, Loon Mountain hired O'Rourke as a seasonal employee in its Food and Beverage Department.  A few weeks later, Loon also hired O'Rourke as a seasonal employee in its Accounting Department.  O'Rourke split her time between the two departments.  Seasonal employment at Loon Mountain coincides with the ski season, which usually runs from November to late March or early April.

Although O'Rourke's employment in the Food and Beverage Department normally involved serving food and beverages at the Octagon Lodge, she was assigned to work at Java Junction on Saturday and Sunday, January 22 and January 23, 2011.  Java

3

Junction is located in a separate building from the Octagon Lodge.  It is not a busy venue, and is generally staffed by a single employee.  Part of the Java Junction employee's job is to transport products from the Octagon Lodge to Java Junction, including soda, water, and other items.  Plaintiff had not previously worked at Java Junction.

At the end of the workday on Saturday January 22, O'Rourke told her assistant manager, Julia Cyr, that she was pregnant and that the pregnancy was high-risk.  She told Cyr that she would, therefore, need assistance moving product from Octogon Lodge to Java Junction.  According to O'Rourke, Cyr seemed "very offset, set back" upon hearing that O'Rourke was pregnant.  At her deposition, O'Rourke explained that "my feeling was that it was slightly irritating because of the time of year.  We were coming into a vacation week, it was very busy, and my feeling was that it was an inconvenience at the time."  O'Rourke Dep., doc. no. 17-4, at 45.

Cyr agreed to have someone help O'Rourke move product from Octagon Lodge to Java Junction the next day, although she noted that Loon was short-staffed and that there might be a delay in getting assistance.  Given the seasonal nature of O'Rourke's employment with Loon, O'Rourke would not have worked for Loon during most of her pregnancy.  O'Rourke's seasonal employment was

4

scheduled to end in less than three months – approximately the beginning of April.  Her delivery due date was in September, about five months after her seasonal employment was expected to end.

O'Rourke worked at Java Junction the next day, Sunday January 23.  A co-worker assisted her in moving soda and water from the Octagon Lodge to Java Junction.  Later that morning, Cyr visited Java Junction as part of her normal rounds.  When she entered the café, there were no customers and she could not see O'Rourke.  According to Cyr, she looked around the corner and saw O'Rourke crouched behind the counter with a can of whipped cream in her hands and between her legs, with the top of the can pointed upward.  Another can of whipped cream and spilled whipped cream were on the floor near her.  According to Cyr, O'Rourke seemed "startled" when she saw Cyr.  The two chatted for a few minutes and Cyr left the café.

Cyr testified at her deposition that she suspected that O'Rourke had been doing a "whippit."[1]  Cyr was aware that Loon had recently experienced losses of whipped cream from inventory at other Loon locations, and that Loon management was concerned

---

[1]  Whipped cream cans contain nitrous oxide, which is used as a propellant.  "Doing a whippit" entails releasing the nitrous oxide into one's mouth and inhaling it to attain a temporary feeling of intoxication (or "high").

that some employees had been using the whipped cream to do whippits.

Cyr testified that she wanted to make additional inquires before confronting O'Rourke.  It is undisputed that Cyr returned to the Octagon Lodge and asked an employee to explain how a whippit is performed.  The employee described the process, which was consistent with what Cyr says she saw O'Rourke doing at Java Junction.  Cyr then asked two Food and Beverage Department employees to go to Java Junction to observe and report back to Cyr anything that seemed unusual.  The first employee reported to Cyr that O'Rourke was not at Java Junction and that there was whipped cream on the floor.  The second employee reported to Cyr that O'Rourke was at Java Junction, but was flustered and making odd statements about whipped cream.

Cyr then went to the Octagon Lodge and checked the product transfer sheet for Java Junction.  The transfer sheet showed that seventeen cans of whipped cream had been transferred to Java Junction on the previous day, Saturday, January 22.  Cyr informed Loon's human resources department.  She was advised to return to Java Junction with another employee, as a witness, and to question O'Rourke.  Cyr returned to the café with Shannon Hartwell, another Food and Beverage Department manager.  Cyr did not explain the situation to Hartwell because, she says, she

6

wanted Hartwell to be an unbiased witness.  Cyr approached
O'Rourke and told her that there was "an inventory control
problem with whipped cream" and that Cyr "suspected that she
caught [O'Rourke] inhaling the whipped cream."  O'Rourke Dep.,
doc. no. 24-2, at 29.  O'Rourke did not give Cyr any explanation.
Instead, she asked Cyr "Why would I ever do something like that"
while pregnant?  Id. at 30.  She also asked, "if you thought I
was impaired . . . why would you let me stay for hours?"  Id. at
32.

     Cyr then asked O'Rourke to count the number of cans of
whipped cream that were in inventory at Java Junction.  Only four
of the seventeen cans that had been brought over from the Octagon
Lodge the day before remained in inventory.  The thirteen cans
that were no longer in inventory represented an unusually high
amount of whipped cream use for a single day at Java Junction.
Although several days later O'Rourke told other Loon authorities
that she found used cans of whipped cream in the trash when she
arrived at Java Junction that morning, she did not mention that
purported fact to Cyr at the time Cyr questioned her.

     Cyr then told O'Rourke that she would be sent home, but that
O'Rourke first needed to meet with Ralph Lewis, Director of
Operations, to discuss the situation.  Cyr and Hartwell then
accompanied O'Rourke to Lewis's office.  Lewis asked O'Rourke

what she had been doing with the whipped cream.  O'Rourke did not
offer any explanation, but said "Ralph, you know me.  This isn't
. . . something I would do.  You know, like, I handle all the
money for the resort.  Stealing whipped cream or doing whipped
cream . . . [is] not something in my character or something I
would do."  Id. at 34.[2]  Lewis told O'Rourke there would be a
further investigation before a decision was made regarding her
continued employment.  Crediting O'Rourke's version of the facts,
it also appears that O'Rourke offered to take a drug test, have
her bag searched, and take a lie detector test.  Those requests
were ignored.

Because Lewis was concerned that O'Rourke might be under the
effects of nitrous oxide, he arranged for a security officer to
take O'Rourke home.  At her request, O'Rourke was taken instead
to a local store.[3]

———————————

[2]  It is undisputed that O'Rourke did not provide Lewis with
an explanation.  Lewis swore to that fact in his declaration.  At
her deposition, O'Rourke testified that she could not remember
exactly what she told Lewis in response to his questioning and
could recall only insisting that she would not do such a thing
given her responsibilities in the accounting department and her
character.  Lewis's averment that O'Rourke did not explain what
she had been doing with the whipped cream is, therefore,
uncontradicted.

[3]  The parties dispute how long O'Rourke had to wait before
being transported and whether she was being involuntarily
detained.  Because those facts are relevant only to plaintiff's
state law claims, over which the court declines to exercise
supplemental jurisdiction, they are not discussed here in detail.

At some point on Sunday, Mary Aylward, a Loon seasonal employee (and the mother of O'Rourke's fiancé) approached Cyr to find out what was happening with O'Rourke.  At her deposition, Aylward recounted the following exchange with Cyr:

Q.  And what happens when Julia [Cyr] returns?

A.  I went downstairs with her and I asked her what was going on.

Q.  And what was her response?

A.  Her response what that if she was doing what I think she was doing, especially being pregnant – I forget the exact words, but I know my response was, you think she was doing it?  And she said, yes."

Aylward Dep., doc. no. 24-4, at 9.


On Tuesday, January 25, Ruth Berkeley, Loon's Director of Human Resources, and Steven Bromley, Loon's Food and Beverage Manager, met to discuss O'Rourke's situation.  Neither Berkeley nor Bromley had been at work on Sunday or Monday.  The two discussed Cyr's reported observations; the fact that thirteen whipped cream cans were missing from Java Junction's inventory; and the fact that O'Rourke had not provided any explanation for what she had been doing with the whipped cream.

Berkeley and Bromley telephoned O'Rourke later that day.  They asked her if she could explain Cyr's observations or explain the missing whipped cream cans.  O'Rourke stated, for the first time, that when she had arrived at Java Junction on Sunday, there

9

were several used cans of whipped cream in the trash.  Berkeley
told O'Rourke that her employment with Loon was terminated for
misuse and misappropriation of whipped cream.

O'Rourke denies that she was doing a whippit when Cyr
entered Java Junction on Sunday, January 22.  During her
deposition, O'Rourke testified that she had not been, as Cyr
claims, crouched under the counter.  Rather, she says, she was
standing and leaning to one side to see if plates had been
stocked under the counter, and was holding a cup of coffee in her
left hand into which she had just placed whipped cream.  And,
O'Rourke has produced evidence that Loon security and maintenance
personnel had access to the inventory of whipped cream at Java
Junction during off-hours.

O'Rourke has also produced evidence about a prior incident
involving a male employee.  At his deposition, Lewis testified
that in some previous year (he does not specify the date), he
interviewed a male employee whom he suspected had been using
Loon's whipped cream to do whippits.  The full sum of the
evidence plaintiff has produced relating to this prior incident
consists of the following deposition testimony:

> Q.  Okay.  And were any people, any employees interviewed
> about the missing whipped cream?

10

A.  I believe I spoke to a security officer about it that I
had suspected possibly he was doing it.

Q.  Which security officer is that?

A.  I don't know.

Q.  There's no record of the meeting?

A.  No, there wouldn't be.

Q.  So you have no idea who you interviewed about it?

A.  I would have to go back through the names.  It's been a
while.  And the security force changes year to year.

Q.  So this meeting with the security officer, tell me about
that?  What did you say to him?

A.  I asked him if he knew anything about it.  He said no.
And I asked a supervisor to watch him.

Q.  Which supervisor?

A.  Joe Chivell.

Q.  So he denied it, so you didn't have any evidence?

A.  No.

Lewis Dep., doc. no. 24-6, at 3-4.

And, O'Rourke has produced some evidence suggesting that her

fiance's mother, Mary Aylward, was not hired back for seasonal

work with Loon in 2011 in retaliation for O'Rourke having filed a

pregnancy discrimination charge with the New Hampshire Commission

for Human Rights.


**Discussion**

O'Rourke brought this suit against Loon in New Hampshire

Superior Court, alleging violations of numerous state laws and

11

pressing two federal claims under Title VII, 42 U.S.C. § 2000e.
Loon timely removed the case to this court.  After the close of
discovery, Loon moved for summary judgment on all counts.  For
the reasons given below, the motion is granted with respect to
the federal claims (Counts II and IV), and, consistently with
normal practice, the court declines to exercise supplemental
jurisdiction over the remaining state law claims.

In Count II of her complaint, O'Rourke alleges that she "was
terminated because of her gender/pregnancy, and that the
allegations regarding her 'inhaling' whipped cream were
pretextual."  Complt., doc. no. 1-1, at ¶¶ 23, 28.  She denies
that she inhaled nitrous oxide from the whipped cream can, and
she argues that Loon actually fired her because of the
inconvenience her pregnancy would cause Loon's operations.  Pl.
Br., doc. no. 24-1, at 2, 12-13.  In Count IV, O'Rourke alleges
that Loon refused to rehire Mary Aylward, her fiance's mother, in
retaliation for O'Rourke's having filed a pregnancy
discrimination charge with the New Hampshire Commission for Human
Rights.

## I.  <u>Pregnancy Discrimination</u>

Title VII prohibits covered employers from discriminating
"against any individual with respect to his compensation, terms,
conditions, or privileges of employment, because of such

individual's . . . sex."  42 U.S.C. Sec. 2000e-2(a)(1).  The

Pregnancy Discrimination Act of 1978 "extended Title VII's

protection against discrimination to specifically include

discrimination 'on the basis of pregnancy.'"  <u>Martinez-Burgos v.</u>

<u>Guayama Corp.</u>, 656 F.3d 7, 12 (1st Cir. 2011) (quoting 42 U.S.C.

Sec. 2000e(k)).  "A pregnant employee may be discharged, however,

if the employer 'does so for legitimate reasons unrelated to her

pregnancy.'"  <u>Id</u>. (quoting <u>Smith v. F.W. Morse & Co.</u>, 76 F.3d

413, 424 (1st Cir. 1996)).


Under the familiar burden-shifting framework set out in

<u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973), O'Rourke,

who does not have direct evidence of discrimination,[4] must make

out a prima facie case of pregnancy discrimination by showing

that: "(1) she [was] pregnant . . ., (2) her job performance

[had] been satisfactory, but (3) the employer nonetheless

dismissed her from her position . . . while (4) continuing to

have her duties performed by a comparably qualified person."

<u>Smith</u>, 76 F.3d at 421.  If she succeeds, Loon must articulate a

---

[4]  O'Rourke argues that Cyr's comment to Aylward ("If she
was doing what I think she was doing, especially being pregnant")
is direct evidence of discriminatory motive.  It is not.
"'Direct evidence of discriminatory intent in pregnancy
discrimination cases generally is in the form of an admission by
a supervisor or decision maker that the employee was
[disciplined] because she was pregnant.'"  <u>Vasconcellos v. Pier 1</u>
<u>Imports (U.S.), Inc.</u>, 2008 WL 4601036,at *4 (D.R.I. April 28,
2008) (quoting <u>Kennedy v. Schoenberg, Fisher & Newman, Ltd.</u>, 140
F.3d 716, 723 (7th Cir. 1998)).

legitimate, non-discriminatory reason for its decision.  If Loon carries that production burden, the initial presumption of discrimination disappears, and the burden shifts back to O'Rourke "to point to sufficient evidence to demonstrate that" Loon's "proffered reason is mere pretext and that the true reason is discriminatory."  Martinez-Burgos, 656 F.3d at 12.

O'Rourke has carried her modest burden of making out a prima facie case of unlawful discrimination.  In response, Loon has proffered a legitimate, non-discriminatory reason for the termination, specifically, that it believed O'Rourke had performed a whippit during working hours and that she misappropriated whipped cream from Loon's inventory to do so. Evidence supporting Loon's proffered reason is substantial, and includes Cyr's report of what she saw; observations by employees sent to Java Junction; confirmatory information provided by employees regarding how a whippit is performed; the fact that thirteen cans of whipped cream were inexplicably missing from the café only one day after being transferred there; and the fact that O'Rourke did not provide any explanation regarding Cyr's observations and the whipped cream can, much less a plausible one, when initially confronted by management, and only offered her plainly contradictory version of events (whipped cream cans in trash) two days after the incident.

In other words, Loon has presented evidence supporting its
claim to have discharged O'Rourke for reasons entirely unrelated
to her pregnancy.  The burden of proof, therefore, reverts to
O'Rourke to point to sufficient evidence in the record from which
a rational jury could reasonably find that Loon's proffered
reasons for discharging her were pretextual, and that it fired
her because she was pregnant.  O'Rourke has failed to carry that
burden.

O'Rourke "has to clear two significant hurdles before [s]he
is able to show pretext."  Tobin v. Libery Mut. Ins. Co., 433
F.3d 100, 105 (1st Cir. 2005).  First, O'Rourke "must refute"
Loon's rather clear evidence that it believed she had been doing
a whippit and that "constituted the real reason for [her]
termination."  Id.  She may call Loon's proffered justification
into question by pointing to "weaknesses, implausibilities,
inconsistencies, incoherencies, or contradictions in" the
justification sufficient to allow a factfinder to reasonably
"infer that [Loon] did not act for the asserted non-
discriminatory reasons."  Martinez-Burgos, 656 F.3d at 14
(internal quotation marks omitted).  Second, O'Rourke "must
advance evidence of [her] own showing that" Loon's "asserted
reason was a pretext for hiding discrimination."  Tobin, 433 F.3d
at 105 (emphasis added).  In other words, she must point to
evidence from which a jury could reasonably find that "the

15

reasons given for [firing] her were both a sham, and a sham
intended to cover up a discriminatory motivation." Taite v.
Shineski, 2010 WL 745160, at *11 (D.N.H. Mar. 1, 2010). See also
Mesnick v. Gen. Elec. Co., 950 F.2d 816, 824 (1st Cir. 1991) ("It
is not enough for a plaintiff merely to impugn the veracity of
the employer's justification; he must elucidate specific facts
which would enable a jury to find that the reason given is not
only a sham, but a sham intended to cover up the employer's real
motive: age discrimination.") (internal quotation marks omitted).

O'Rourke argues that Loon's "claim that Plaintiff was caught
doing a whippit is beyond implausible." Pl. Br., doc. no. 24-1,
at 12. It is implausible in part, she says, because she did not,
in fact, do a whippit. But "[i]n assessing pretext, a court's
focus must be on the perception of the decisionmaker, that is,
whether the employer believed its stated reason to be credible."
Mesnick, 950 F.2d at 824 (internal quotation marks omitted).
Whether O'Rourke did or did not use the whipped cream cans to
recreationally inhale nitrous oxide while at work is not really
the question. The important question is whether Loon thought she
did, and imposed discipline for that reason.

O'Rourke argues that Loon could not reasonably have believed
that she had done a whippit because she told Cyr that her
pregnancy was high-risk. But a pregnant woman – even one with a

high-risk pregnancy – might irresponsibly use nitrous oxide for recreational purposes.  O'Rourke also points to the fact that Loon management did not take her up on her offers to have her purse searched, take a lie detector test, and be transported to a hospital for drug testing.  O'Rourke does not explain, however, what pertinent or relevant information might have been gleaned from searching her purse.  And the fact that Loon did not take the more extraordinary (and presumably costly) steps of arranging for a polygraph examination or a trip to the hospital for drug testing, does not call into question Loon's proffered reason for imposing discipline.  See Wierman v. Casey's Gen. Stores, 638 F.3d 984, 997 (8th Cir. 2011) (rejecting plaintiff's argument that pretext was shown by employer's "failure to ask for her purchase receipts or her side of the story when terminating her," noting that "shortcomings in an investigation do not by themselves support an inference of discrimination.") (internal quotation marks omitted).

O'Rourke asserts, as well, that Loon's proffered justification is called into question by the fact that O'Rourke was not relieved of her duties at Java Junction immediately, but instead was allowed to continue working there for two to three hours after Cyr purportedly observed her doing a whippit.  On its face, Loon's delay might be construed as inconsistent with a

belief that O'Rourke had been doing a whippit and was under the influence of nitrous oxide.  But context is important.

Cyr testified that she did not immediately confront O'Rourke because she wanted to gather confirmatory information first, and her actions were entirely consistent with that approach.  After leaving Java Junction, Cyr returned to the Octagon Lodge and asked an employee (presumably one who might know) to explain how a whippit is performed.  She then sent two employees to Java Junction to observe O'Rourke and report back to her.  Cyr also checked the product transfer sheet at the Octagon Lodge to determine how many cans of whipped cream had been delivered to Java Junction the day before.  Cyr then understandably contacted the human resources department to report the facts as she believed them to be and to receive instructions.  Consistent with the instructions she was given, Cyr recruited another employee to accompany her back to Java Junction to question O'Rourke.  Having gathered sufficient information, Cyr confronted O'Rourke.  After speaking with O'Rourke, and having determined that thirteen cans of whipped cream were inexplicably missing, and having been given no explanation by O'Rourke, Cyr told O'Rourke that she was to see Lewis and would be sent home thereafter.

The limited delay between Cyr's first observation of O'Rourke and her return to Java Junction does not reasonably call

18

Loon's proffered justification into question.  During that time
period Cyr conducted a brief but prompt investigation, gathered
pertinent information, appropriately informed management of the
pending circumstances, and arranged to confront O'Rourke.  Cyr's
conduct was fully consistent with a careful and fair approach to
a probable case of employee misconduct.

Finally, O'Rourke argues that Loon's dissimilar treatment of
a male employee suggests that Loon's proffered reason for
discharging her was pretextual.  It is true that "[a] plaintiff
can demonstrate that an employer's stated reasons are pretextual
. . . by producing evidence that plaintiff was treated
differently from similarly situated employees."  Garcia v.
Bristol-Myers Squibb Co., 535 F.3d 23, 31 (1st Cir. 2008)
(internal quotation marks omitted).  O'Rourke has not, however,
produced any evidence that she was similarly situated to another
employee but was treated differently.  See id. ("The comparison
cases need not be perfect replicas, but . . . they must closely
resemble one another in respect to relevant facts and
circumstances.") (internal quotation marks omitted).  To the
contrary, what evidence O'Rourke has produced suggests the
opposite, i.e., that the male employee she points to for
comparison was not in the same situation as she.  Loon's
management questioned that male employee based on its mere
suspicion, without any evidence, that the employee had been doing

19

whippits, misappropriating Loon's inventory of whipped cream.
The male employee denied it, and, lacking any contrary evidence,
Loon's management did not take any action against him (although
it did increase its supervision).  In contrast, with respect to
O'Rourke, Loon had solid evidence - and not mere suspicion - that
O'Rourke had used nitrous oxide from misappropriated whipped
cream cans while working in Java Junction.

In sum, the evidence here does not even paint a "merely
colorable" claim of pretext, and therefore, does not present a
triable issue for a jury.  <u>Anderson</u>, 477 U.S. at 249.  But, even
assuming, for argument's sake, that O'Rourke met her burden with
respect to pretext, she has not pointed to evidence that is
"significantly probative," <u>id</u>., of a discriminatory motive.
O'Rourke argues that a reasonable inference of discriminatory
motive arises from: (1) the purported fact that her pregnancy was
an inconvenience to Loon; (2) the fact that Cyr seemed "set back"
or "surprised" when O'Rourke told her she was pregnant; (3) Cyr's
response to Aylward's inquiry about what was happening with
O'Rourke ("if she was doing what I think she was doing,
especially being pregnant"); and (4) the supposed fact that Loon
fired O'Rourke the day after she told Cyr that she was pregnant.

Although there is some evidentiary dispute about whether
O'Rourke was fired on Sunday or the following Tuesday, the

inference will be drawn in O'Rourke's favor, and the court will assume that O'Rourke's employment was terminated on Sunday, the day following her announcement to Cyr that she was pregnant. Although close temporal proximity may help establish pretext and discriminatory motive, it is not sufficient by itself to create a jury question. See generally Horstkotte v. Comm'r, New Hampshire Dept. of Corrections, 2010 WL 1416790, at *5 (D.N.H. April 2, 2010) (relying on Layne v. Vinzant, 657 F.2d 468, 476 (1st Cir. 1981)). That is especially true here, where the significance of the timing is diminished by Loon's strong evidence of employee misconduct by O'Rourke and the fact that the alleged misconduct "came even closer in time" to her termination than her pregnancy announcement. Vasconcellos, 2008 WL 4601036, at *5 (finding plaintiff's intervening act of dishonesty, even if disputed, diminished the causal connection between her pregnancy announcement and her termination) citing Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir. 1999).

O'Rourke's attempt to show more than just temporal proximity fails. O'Rourke posits that Loon's management fired her because her high-risk pregnancy would inconvenience Loon's operations during the busy ski season. But evidence of inconvenience is scant at best, consisting only of Cyr's statement to O'Rourke that it might be a while before Cyr could get another employee to help O'Rourke move soda and water to Java Junction. There is no

evidence that that contemporaneous circumstance posed an ongoing problem for Loon.  To the contrary, the fact that a co-employee helped O'Rourke move water and soda to Java Junction the next day, seemingly without incident or hassle, suggests that any inconvenience was slight.  That posited but minimal inconvenience, therefore, simply cannot suggest a motive to fire O'Rourke.

Similarly weak is the evidence that Cyr seemed "set back" or "surprised" when O'Rourke told her that she was pregnant. O'Rourke argues that Cyr's non-verbal reaction supports a reasonable inference that Cyr was hostile to the news of O'Rourke's pregnancy.  The inference, however, is not reasonable because it is entirely too speculative.  See Vasconcellos, 2008 WL 4601036, at *6 (finding that plaintiff "offered no objective evidence to support her claim that [her supervisor] 'seemed put off by her being pregnant'"; plaintiff relied only on "vague allegations regarding [her supervisor's] tone and mannerisms but point[ed] to nothing specific"); Keyes v. Catholic Charities, 2011 WL 713640, at *4 (3d Cir. March 2, 2011) (plaintiff's "speculative perception that his supervisors changed their attitude towards him when they heard about his sleep apnea" based on their "'non-verbal reactions'" to him, "in no way" raised a triable issue).

O'Rourke also relies on Aylward's testimony that Cyr used the phrase "if she [O'Rourke] was doing what I think she was doing, especially being pregnant."  Regarding the relevance of that phrase to the issue of motive, O'Rourke's only argument is that Cyr "used the words pregnant and termination in the same sentence, so it obviously was part of her reasoning."  Pl. Br., doc. no. 24-1, at 10.  The record reveals, however, that Cyr did not use the word "termination."  Notably, O'Rourke has not presented any further argument or theory that would tie Cyr's comment to Loon's decision to terminate O'Rourke's employment, and the record probably would not support it in any event.

Instead of demonstrating pretext and discriminatory motive, the evidence shows quite clearly that Loon took steps to accommodate O'Rourke's pregnancy, and did not discipline her for it.  The evidence does not reasonably suggest that Loon fired O'Rourke for any reason other than its belief that she had been misappropriating company inventory to engage in recreational drug use on company time.

The evidence is insufficient to support a determination, by a rational and reasonable jury, that Loon's stated reasons for terminating O'Rourke – serious misuse and misappropriation of company property – were pretexts for pregnancy discrimination.  And even assuming the existence of a triable issue regarding

23

pretext, the evidence is insufficient to allow a reasonable jury
to conclude, with respect to the ultimate issue, that O'Rourke's
pregnancy motivated Loon to terminate her employment.


II.  <u>Retaliation</u>

     Title VII states that:

     It shall be an unlawful employment practice for an
     employer to discriminate against any of his employees
     ... because he has opposed any practice made an
     unlawful employment practice by this subchapter, or
     because he has made a charge, testified, assisted, or
     participated in any manner in an investigation,
     proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).


     Under the anti-retaliation provision, an employer may not
take adverse action against an employee who complains of
discrimination.  <u>Thompson v. N. Am. Stainless, L.P.</u>, __ U.S. __,
131 S. Ct. 863, 870 (2011).  The provision also prohibits an
employer, under limited circumstances, from taking an adverse
employment action against a third-party in retaliation for the
employee's complaint.  <u>Id</u>.  Such third-party retaliation claims
are brought by the third party, not the complaining employee, <u>see</u>
<u>id</u>., as O'Rourke seeks to do here.


     O'Rourke asserts a claim under Title VII's anti-retaliation
provision based upon Loon's subsequent decision not to rehire her
fiance's mother.  She alleges that Loon took that action in

24

retaliation for O'Rourke's having filed her own charge of discrimination with the New Hampshire Commission for Human Rights.  O'Rourke's claim necessarily fails as a matter of straight-forward application of existing law.

O'Rourke has not offered any principled argument, or pointed to any legal authority, supportive of her contention that she is entitled to press a retaliation claim on her own behalf for Loon's alleged subsequent adverse action against Aylward.  Nor could she.  To prevail on such a retaliation claim, O'Rourke must not only prove that she engaged in protected activity, but she must also show that she "suffered a material adverse employment action" brought on by her protected activity.  Gomez-Perez v. Potter, 2011 WL 6445569, at *8 (1st Cir. Dec. 22, 2011).  O'Rourke is not able to make that showing because the adverse employment action that she points to was adverse to Aylward, not to her.  Indeed, by the time O'Rourke filed her discrimination charge, she was no longer employed by Loon, and so could not experience an adverse employment action linked to her protected activity.

For these reasons, judgment as matter of law in favor of Loon on O'Rourke's retaliation claim (Count IV), is necessarily warranted.

25

**Conclusion**

For these reasons, Loon's motion for summary judgment, doc. no. 17, is granted as to O'Rourke's federal claims (Counts II and IV).  Because the court declines to exercise supplemental jurisdiction over the remaining state law claims, Loon's motion for summary judgment is denied as to those claims.


**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

February 7, 2014

cc:  Leslie H. Johnson, Esq.
     Donald L. Smith, Esq.
     Margaret A. O'Brien, Esq.

26